Gaston, Judge.
 

 Thomas Stokes, of the county of Chat-ham, died intestate in the year 1811, leaving three children, Jordan, Sylvanus and William B. Stokes, and administration on his estate was granted to the defendant. William, the eldest of the children, died shortly after his father, leaving a widow aud one child, Hannah H. Stokes, and the defendant also administered on his estate. Hannah H. Stokes being an infant, the defendant, after the death of her father, was appointed her guardian. On the 22d of January, 1824, she intermarried with Robert Carloss, the son of the defendant, who died intestate in the month of October, 1827, leaving the said Hannah and three infant children surviving. In the month of October, 1830, she intermarried with George H. Shutt, and on the 7th of March, 1831, they filed this bill.
 

 The bill alleged that, at the time of the intermarriage of the plaintiff Hannah with her first husband, she was not quite fourteen years of age, she having been born on the 14th of ''larch, 1810; that the said marriage was procured by the influence and management of the defendant; thatRobert Car-loss, at the time of the marriage, had little or no property, but was dependent on his father, who had considerable landed and personal estates; that no settlement of any kind was made upon her, at the time of the marriage; that Upon the marriage he received from her guardian a large part of her estate, and either wasted it or so encumbered it with his debts, that the same had been lost to her; that, upo'n his death, administration of his effects was granted to the defendant, who, as such administrator, had taken possession of part of the property, which had been hers, claiming it as the property oí the said Robert. The complainants insisted, in the first place, that the defendant, having suffered or procured the said Hannah to be married at such a tender age, without the consent oi advice of the Court, and without any settlement, was bound to make good whatever loss' s'hte' had sus
 
 *234
 
 tained, particularly as the marriage was with his own son, and therefore was to be held to account with the plaintiffs, as guardian of the said Hannah up to the time of her last marriage. And they further insisted that the first marriage of the said Hannah having taken place before she was fifteen years of age, without a certificate from the defendant, her guardian, that she had attained the age of fifteen years and had his permission to marry, and this being known to the defendant, her first husband acquired no right by the said marriage to any part of her property real or personal, by reason of the provisions of an act of the General Assembly of this State, passed in the year 1820, entitled “An act concerning the marriage of female infants;” and that all the estate, both real and personal, which she had at the time of that marriage, ought to be delivered over to the plaintiffs by a decree of this Court. They complained of the defendant refusing to come to an account with them concerning his administration of the estate of Thomas Stokes, and of his guardianship aforesaid, and of the loss sustained’ by the plaintiff Hannah, by reason of her first marriage, or
 
 to render any
 
 account of his guardianship during the time she was the wife of his son, and to make good to them the debts of his said son paid out of her estate; and prayed that all proper accounts might be taken, that the defendant might be decreed to stand as a trustee of all the plaintiff Hannah’s property
 
 during
 
 hercoverture with Robert Carloss and up to the time of her marriage with the pluintiffThomas, and account for the same, and the rents, hire and profits thereof, and make good all losses, which she had sustained by reason of her first marriage, and makegood all the debts of her Said first hüsband paid out of her estate, and for general relief.
 

 The defendant in his answer set forth an account of his administration of the estate of Thomas Stokes, as the same appeared of record in thecounty court of Chatham, taken by order of said Court, on the petition ofSilvanus and Jordan Stokes, by commissioners for'that purpose appointed, whereby it appeared that there Was a balance due to him of $706 20 cts., and averred that the said account was true and just. He stated also that in conformity with the decree made upon that
 
 *235
 
 petition and confirming that report, he settled in full with the said Silvanos and Jordan. The defendant further stated William B. Stokes, at the time of his death, had no property but what was coming to him from the estate oí his father, Thomas Stokes, and died excessively indebted. And he referred to the account current of his administration of the property, which was allotted to him as the administrator of William in the division ol Thomas Stokes’s estate, as the same was returned to the County Court of Chatham, and was there of record, and averred that the same was correct! He also averred that he had settled in full with Hardy Christian and Ruth his wiie, which said Ruth was the widow of William B. Stokes, for her distributive share in William B. Stokes’s estate. The defendant further averred that, after the marriage of the plaintiff Hannah with Robert Carloss, the defendant delivered over to the said Robert all the property of his said wife, and had a full settlement of his accounts as her guardian, upon which settlement a balance was found in his favour of §382, declared that this balance was just and true, and said that it was understood and agreed between himself and the said Robert, when this settlement was made, that the defendant should not require payment of the said balance, but relinquish his claim therefor to the said Robert and his wife, by way of advancement to the said Robert his son. The defendant did not admit that the plaintiff Hannah, at the time of her intermarriage with the said Robert, was under the age of fifteen years, and especially denies that, at the time of the said marriage, if in truth she was under that age, he knew that she was so, or that his son knew it; but on the contrary saith that he did then believe her to be over the' said age, which belief was founded on her appearance, she being a well grown and stout young woman. He admitted that he had administered on the estate of Robert Carloss, and had paid off his debts, a large proportion of which had been' contracted in building a dwelling house and making other permanent improvements on the real estate of the plaintiff Hannah. To this answer the plaintiff put in a general replication, and at the September Term, 1832, the following order was made: “ By consent of parties, without prejudice
 
 *236
 
 in any form to either party, on any of the matters alleged or insisted on, the master is directed to state the accounts of the defendant, 1st, as administrator of Thomas Stokes, deceased; as ad™nistrator °f William B. Stokes, deceased; 3rd, as administrator of Robert Carloss, deceased; 4th, as guardian of Hannah Shutt, the plaintiff, and report said accounts to the next term. The master is directed further to report what was the age of the said Hannah, when' she married Robert Carloss, and the time of such marriage; the value of her estate, and the value of said Robert’s estate at tbeir said marriage; and particularly the master is directed also to report the value, nature and condition of said Hannah’s estate in Virginia and Tennessee, with any other special matters, which either of the parties shall require of him, connected with this suit.” This order of reference was renewed from Term to Term, until September Term, 1836, when the master made his report, to which were annexed long and detailed accounts of the administration by the defendant of the estate of Thomas Stokes, and also ol the estate of William B. Stokes, and also an appount of the defendant as guardian of the plaintiff Hannah until her intermarriage with Robert Car-loss in 1824, when the master stated that, all her property was then delivered over tq the said Robert. The master reported that, on the account of the defendant, as administrator of Thomas Stokes, there was a balanpe due to the defendant of $819 91 cents; that, on his account as administrator of William B. Stokes, there was a balance in his favor of $389 17H cents; and that, on his guardian account there was a balance due him of $394. The master’s report found that the plaintiff Hannah, at the time of her marriage with Robert Carloss, was pnder the age of 14 years, and was worth in real and personal property the sum of $9,800, and that Robert Carloss was then worth a horse, bridle and saddle, and perhaps a few hundred dollars in cash;, and that, at the death of the said Robert, the condition of the estate of the. said Hannah was not materially changed. The master further reported that he did not state the defendant’s accounts, as administrator of Robert Carloss, for the reason that
 
 *237
 
 the defendant averred that he was not ready to
 
 go
 
 into that account, and it was not insisted upon by the plaintiffs.
 

 To this report several exceptions were taken by the plaintiffs, and one exception by the defendant. And, the parties having completed their proofs, the cause was set down for hearing and transmitted to this court, where it has been heard, as well upon the equity arising upon the pleadings and proofs, as upon the several matters included in the exceptions of the parties.
 

 It appears from the proofs in the cause, as well as upon the finding of the master, that the plaintiff Hannah, at the time of her marriage with the defendant’s son, was under the age of fourteen years. It does not appear that this fact was known either to the father or the son, and the deferid-, ant’s positive averment, that he believed her to be over fifteen years of age, is so confirmed by the testimony with respect to her womanly appearance at that time, that the court yields credence to it. He knew, however, that she was very young, and might so easily have qscertained, by enquiring of her mother, whether she had or had not attained the age of fifteen, that his- neglect to make that enquiry is nearly equivalent to knowledge of the fact, that she was under that age. There is no proof that the defendant employed any arts, or exercised his influence as gqqrdian, to bring about the marriage. When it took place, she was residing with her mother, and without the consent and against thp wjll of her mother, ran away with Robert Carloss to be married, It sufficiently appears, however, that the defendant was well aware of the intended marriqge, and made no effort to prevent it. We hold therefore that the marriage took plape with his connivance, if not dirept approbation. It was an unequal marriage in point of fortune. The husband had scarcely any property, and she was worth nearly ten thousand dollars. His father, however, was a man of considerable estate and respectable standing in society, and the young man had reasonable expectations of fortune from him at a future day. He had recently arrived at age, and, notwithstanding a propensity for dissipation, which had begun to manifesf it? self, and which greatly increased after marriage, was of in?
 
 *238
 
 habits, and supported himself by his industry. This dissipation did not produce that extravagance, which usually results from it; for he did not impair the estate, of squired possession by the marriage. He improved his wife’s land, and the debts which he left were almost exclusively contracted in making these improvements.— There is no proof that he treated his wife ill, or that they lived otherwise than happily together until his death. Three children were the fruits of this union, all of whom, for aught that appears, are still living.
 

 The main question for us to- decide is, whether, upon these facts, the defendant can- be declared a trustee of the estate of the plaintiff Hannah, after her said marriage, and therefore bound to account to the plaintiffs for said property, notwithstanding his having delivered it over to her first husband. It is only on this ground that the bill of the plaintiffs can be supported. Whatever opinion may be entertained as to the delicacy or propriety of the defendant’s conduct, in sanctioning a marriage of his ward at that tenderage with his own son, even though he may have thereby rendered himself liable to punishment, this court, acting as a Court of Equity, has no jurisdiction over him in regard to the'matters complained of, except to enquire whether he has faithfully accounted for her estate committed to his care. Now We are. unable to see any satisfactory ground, on which this question can be determined in the affirmative. Upon .the marriage of the defendant’s female ward with an adult husband, the defendant’s office of guardian ceased. Hargrave’s Co. Lit. 88, b. note.
 
 Mendez
 
 v. Mendez, 1 Ves. Sen. 91—
 
 Roach
 
 v.
 
 Garvan,
 
 1 Ves. Sr. 157, and, upon the marriage, the. husband became the owner of all her personal property in the hands of the defendant, and seized in her right of all her real estate.
 

 The first ground taken in the bill, why this court should hold the defendant accountable as guardian, notwithstanding his office had expired, and he had delivered over the property and accounted for his management thereof to the owneris, that'having permitted a marriage, so unequal in point of fortune, to be contracted by his ward, without the consent of
 
 *239
 
 the proper court, and without exacting a settlement from the husband, he is bound to make good the loss of property she has thereby sustained. This ground we think clearly untenable. It is not pretended to have been ever adjudged, , J = ’ that a guardian is
 
 bound,
 
 under any circumstances, to require a settlement of his ward’s property upon her, before he permits her to marry. The novelty of the position assumed is an exceedingly strong objection to it. Innumerable cases have occurred of marriages by female wards, and many of them have no doubt proved indiscreet and unfortunate. Perhaps in notin one in a thousand has any settlement been made, and as yet we have heard of no attempt but this to render the guardian liable, because of the omission to require one. She has, on reaching twelve years of age, the legal ability to contract marriage, independent of any one’s will; the consequences of marriage on her property are defined by law; and, howeverexpedient.it may be
 
 sometim.es
 
 to guard against these consequences,.it has not been made the duty — and probably it ought not to be made the duty — of any one'io guard against them by marriage settlements.- It is only in a very artificial state ot society, that- these can become common, or be regarded as generally useful. It has been argued that cur act of 1762 (Rev. St. c. 54, s. 18,) makes it the duty of the courts, on receiving information that a guardian is about to marry his ward “in disparagement,” to remove him from the guardianship; that this is a distinct recognition with us that the permitting of such a marriage is a breach of duty; that the marriage of the defendant’s ward to his son was one of this character; and that it is a principle of universal application that he, who-, by a breach of duty, has occasioned a loss, should, to the extent of his ability,- repair that loss.
 

 Before examining this argument particularly, it occurs to us, as not a little extraordinary, if the law-makers contemplated such a liability upon guardian's,-aá that now contended for, that in defining their duties; in- acts where minute details are found — such as in regard- to" the mode of selling their perishable estate, the keeping of t-h'eir stock, the lending out of their money, hiring of slaves, renting of lands and payment of the taxes, disposition of the lightwood, boxing of the
 
 *240
 
 pine trees and sale of the timber on. their lands — it has not been distinctly and plainly declared. But upon the argilmerit it may be remarked, in the first place, that the law is *n<^ee(^ solicitous to prevent a marriage being made in “disparagement,” and chiefly so, because it belongs to that class of evils, which, once done, admits of no remedy or redress. What pecuniary measure can be resorted to, for ascertaining the injury from an ill-assorted marriage? And if one could be found, how wisely the law would act, in a case where a woman had thus married, in allowing the husband to put into
 
 his
 
 pocket the damages recovered because of this grievous wrong to
 
 her?
 
 The ancient law sternly prohibited what it termed marriages “ in disparagement,” both by Magna Chan-ta and the Statute of Merton. Yet we are told by the highest authority “that no action can be brought upon this statute, inasmuch as it was never seen or heard that any action was brought upon the S'faute of Merton, for this disparagement, against the guardian for the matter aforesaid, &c.; and if any action might have been brought
 
 for this
 
 matter, it shall be intended that at some time it would have been put in ure.” Littleton sec. 108. Co. Lit. 81. b. Besides, inequality offortune never constituted “' disparagement.” Thereby was contemplated some personal or social defect or disqualification, such as deformity, lifnácy, disease, villenage, alienage or corruption of blood. Co. Lit. 80, 81, 82. In no sense,
 
 analogous
 
 to the ancient import of the term, could the marriage of the female plaintiff with her first husband have been deemed a marriage in disparagement. It brought no disgrace on her or her kin; did not put her or them below proper station. As to the charge in the bill that the guardian neglected to ask the advice of fhe Court in relation to the marriage, before he permitted it fo'take place, this, we suppose, has been charged, because of some vague notion that ¡s reqU¡re¿[ fo England of all guardians. We find nothing to warrant that doctrine, and certainly an application to Court for advice on that subject is wholly unknown in our US!,geS- jn England the Court of Chanbery exercises a very high control over the marriage of what are there termed
 
 wards of Court,
 
 and filing a bill in theif behalf makes them
 
 *241
 
 wards of Court. Marrying an infant ward of the Court, without the previous consent of the Chancellor, is there a contempt of the Court, and the Court is enabled by imprisonment of the husband and others concerned in the contempt, to compel what it deems a proper settlement for the wile. If an infant ward of the Court be suspected of intending to make an improper match, the Chancellor will grant an injunction to restrain all communication with the infant by letter or otherwise. When an infant ward of the Court is committed to the care of any person, the Chancellor may require from the committee a recognizance, that such infant shall not marry without the leave of the Court, and if the infant should so marry, though without the privity or knowledge or neglect of the committee, the recognizance is nevertheless forfeited.— Whether these or other extraordinary powers of a like kind
 
 can
 
 be claimed by any Court in this country Over the marriages of those who are competent by law to contract marriage, by making them “ the wards of such court,” we need not stop to enquire. But in England they are exercised only over marriages of “ wards of Court,” and there is no pretence that here the female plaintiff was ever constituted' such.
 

 
 *240
 
 An tion by a gu «relian » conn for fbáuüs'infanf m.iry. is known to" our usages
 

 
 *241
 
 The next ground, upon which the plaintiffs rest their claim. to hold the defendant accountable as still remaining guardian of the plaintiff Hannah after her first marriage, is, for that the said marriage was contracted in violation of the act of 1820, entitled “An act concerning the marriage of female infants.” (Rev. St. ch. 71, sec. 7, c. 34, s. 47.) By that statute it is made an indictable offence, punishable by fine, for a man to marry a female infant under the age of fifteen years, except in the case where her father shall be alive, and shall have, previously to the marriage, given his written consent thereto. It is also enacted that, when the husband shall be convicted of such offence, it shall be the duty of the Court, before whom the conviction may be had, to appoint one or more trustees to take charge of the property belonging to the female so married, and the whole estate, both real and personal, vested in her at the time of such marriage, and all the right, title, &c., shall be vested in and belong to the trustees so appointed by the Court, and they shall have potver to take
 
 *242
 
 the same, and if necessary to sue therefor in their proper names, to hold the estate so received and recovered in trust for the sole and separate use of the said female during the continuance Of the marriave, and, upon the termination , „ ,
 
 ° 7 ,
 
 , thereof, if she Survive, then to convey the same to her absolutely, but, if she do not survive, to convey the same to her children, and, in default of children, to such persons as would have been her distributees and heirs'at law, according to the nature of the estate, in case she had died unmarried; and it is further enacted, that the husband, convicted of such of-fence, shall in no case be permitted to hold, use, enjoy, sell or dispose of any part of the estate, to which she was entitled at the time of the marriage; that all sales and dispositions .made by him of such property before such conviction, should be null and void’; and that he shall not, in case of the death of his wife, be-entitled to administration of her estate, nor to a distributive share thereof, nor-to curtesy therein. It is manifest, upon the least careful examination of the act, that it does not invalidate the marriage, if the female was of the legal áge tó consent, which the common law had fixed at twelve years. It is further manifest that
 
 all
 
 the penalties thereby denounced are necessarily dependent upon conviction of the special offence created by the act, although after conviction, like other forfeitures, they are made to relate back for some purposes to the’time of the commission of the of-fence. The marriage of a female infant, over twelve and under fifteen, as effectually puts ah end to her guardianship as her marriage over fifteen; but in the former case, upon a c'onviction of the husband, the trustees, and hot the husband, become entitled to her property. But it is said, fhat, although this act be in its forms penal, and cannot be carried into direct execution but in the way specially pointed out by the Legislature, yet, so far as its object is protection to the property of infants, a Court of Equity will lend its aid to render such protection effectual. We fully assent t’o this proposition, and hold it to be the duty of the "Court for this purpose to exercise all its powers, preventive or remedial, to the full extent of its jurisdiction. It shall not permit, if it can
 
 help
 
 it, the forfeiture, to the benefit whereof the' infant is entitled,
 
 *243
 
 to be evaded by any subtle contrivance or combination; but will hold all therein concerned trustees, to the full extent of their improper interference, for the infant. But, nevertheless, as the benefit claimed is to result from forfeiture, and that for-
 
 y,
 
 feiture cannot arise.but upon conviction, we are unable to see how any Court, in a case where not only a conviction has not taken place, but where it cannot take place, and this state of things has been produced, not by any fraud, stratagem or combination, but by the act of God, can derive to itself a power of action, legal or equitable, under this act. The aid of the Court has not been invoked to promote or secure the beneficial operation of this statute in behalf of the female plaintiff. The bill is framed
 
 diverso intuitu.
 
 We are not called upon to say what may be the liabilities of a guardian, who, by delivering over the property of his female ward to one, who has married her under the age of fifteen years, and who has been convicted of the offence, has rendered that conviction inoperative to secure to her the beneficial effects of the Statute. We are not considering a case, where a female thus married applies to the Court to have her property protected before conviction of the offence, in order to prevent alienations, which may be prejudicial to her. We are not acting upon a claim, made by a husband, offending against the statute, to obtain possession of his wife’s property, nor even asserting the right of one, privy to that offence, to hold such property beneficially for himself. The defendant here pretends no such claim. The case before us is, in truth, that of a second husband, in his wife’s name, seeking our aid to get this property, as against the creditors of the first husband and the children of his wife by her first marriage; and asking this extraordinary aid, after that marriage had continued, uncomplained of for more than three years, and after four years had passed since the death of the first husband. We cannot see any equity in such a case for enforcing a penal act beyond its enactments and its true spirit.
 

 The exceptions taken to the report of the master are now to be considered. The first exception taken by the plaintiffs, is in the nature of an application to re-commit the report because it is incomplete. It is, that the master has not
 
 *244
 
 reported, as directed by the order of reference, the value, nature and condition of the estate of the plaintiff Hannah, in the State of Virginia. In the order referred to, as having ^een mai^e by consent and without prejudice, this was indeed directed. But we do not need the information intended to be had thereby, to enable us to decide upon any matter put in issue by the pleadings; and we ought not to re-com- ^ rePort bi order to have an immaterial matter ascerThe exception is therefore overruled,
 

 A report recommitder a¡i ascertain-orig?na»y ordered in the refer** ence,
 

 For the same reason, the second and third exceptions must also be overruled. What may be the nature or value of the said plaintiff’s real estate in Tennessee, or what the state of ^
 
 1
 
 the defendant’s accounts, as administrator of Robert Carloss, are matters wholly foreign from what is now in dispute between the. parties.
 

 The fourth exception is, for that the master hath allowed the defendant in the account of his administration of the estate of Thomas Stokes the sum of $608 for his expenses, without proper vouchers to warrant the same. If the item thus excepted to affected the decree to be rendered in the cause, we should be obliged to re-commit the report, in order that the master might inform us, either by reference to the vouchers or otherwise, upon what evidence he made the allowance. The exception admits that it was made upon vouchers, but denies their sufficiency; and we are without the information to enable us to decide upon this appeal taken from his judgment. But the exception, were it to be allowed in full, cannot affect the decree. The accounts of the administration of Thomas Stokes’s estate and of William B. Stokes’s estate, are but preliminary to the account between these parties, upon which the decree depends, that is to say, the account of the defendant as guardian of the female plain, tiff. Upon the account of the defendant as administrator of Thomas Stokes, the master hath found a balance in favor of the defendant of $819 09 cents. In the account of the defendant as administrator of William B. Stokes, he hath credited the defendant with one third of this balance, because William B. Stokes was entitled to one third of Thomas’s estate, and he makes the balance in favor of the defendant as
 
 *245
 
 administrator of William B. Stokes $399 18 cents. And in the guardian account he gives the defendant credit for two thirds of the balance against William’s estate, because two thirds thereof belonged to his ward, and makes a balance on the guardian account in favor of the defendant of $394. Suppose this exception allowed, and add to its amount $18, which is embraced within the 6th exception, making the sum of $626, it would lessen the credit of the defendant in his account as administrator of William B. Stokes by one third thereof, or $202, and his credit in the account as guardian of the plaintiff Hannah) with two thirds of this last sum or $134 66 cents, leaving yet a balance due to the defendant as guardian of more than $250. Now provided there be a balance on this account in his favor, the amount thereof is immaterial, for, whatever it may be, the defendant has relinquished it as an advancement to his son.
 

 The fifth exception of the plaintiffs is, for that the master has not charged the defendant with rents of lands in the State of Tennessee from the year 1814 up to the filing of the bill. So much of this exception as seeks to charge the defendant as guardian, because of rents since the year 1824, cannot be sustained, because the guardianship charged in the bill terminated by the marriage of the plaintiff Hannah with Robert Carloss in that year. But it must be wholly overruled, for, upon examining the proofs in the cause, we do not find that the defendant did receive rents from those lands.
 

 The sixth exception, so far- as it is applicable to the account of the defendant, as administrator of Thomas Stokes, hath been disposed of. It is a good exception to the account of the defendant, as guardian of his ward Hannah, for the sum of $40, which was allowed to the defendant for his
 
 time
 
 in travelling to Tennessee on the business of his ward. Compensation for the time and trouble of a guardian cannot be allowed in that form. These are to Be considered in fixing the quantum of his commissions. But the allowance of this exception is of no use to the plaintiffs, for there will still remain a balance against them.
 

 
 *246
 
 A plaintiff, ^account mi ¡'sh<üT missed on its merits ought to ’ pense^of°aií unnecessary sing re-ex-
 

 The exception taken- by the defendant to the master’s rePort ^ is not .necessary to examine,
 

 It follows that the bill of the plaintiffs must be dismissed. no(; awar(3- c°sts to the defendant, because of our decided disapprobation of that part of his conduct which relates to the marriage of his son. But the plaintiffs must pay the costs of the reference. So far as we have been enabled to Jud§'e> the defendant has managed the estates under his charge with skill, diligence and ability. He made his settlements regularly with the proper persons, and under the sanction of the proper authorities, and has caused his accounts to be filed, where they were accessible to all interested therein. After a laborious and critical examination, but error them has been established, and that rather an error of form than of substance, unimportant in amount, and, when corrected, leaving a balance in his favor. The plaintiffs, we think, ought to bear the expense of this unnecessary and harassing re-examination of these ac,counts.
 

 Per Curiam. , Decree accordingly.